OPINION OF THE COURT
Joseph J. Maltese, J.
Facts
The plaintiff was 34 years old when she sought prenatal care from Dr. Fuchs on September 25, 2003 after becoming pregnant *208 by in vitro fertilization. The plaintiff is a Jehovah’s Witness, and is firmly opposed to receiving “allogenic” blood products derived from other persons. The plaintiff alleges she chose providers of obstetrical care who she believed would honor her desire not to receive allogenic blood products. The plaintiff claims that she would have accepted an “autologous” blood transfusion derived from her own blood for any necessary transfusion, but not the blood of others. A health care proxy signed in 1995, nine years before this hospital admission, explicitly directed that no allogenic blood transfusions should be administered to her.
The plaintiff states she chose Staten Island University Hospital (SIUH) as a medical care provider because SIUH offered “cell salvage technology” and advertised a “bloodless” medicine and surgery program. Cell salvage technology, also known as “cell saver” technology, collects blood cells from a patient that would otherwise have been lost during a surgical procedure, processes those blood cells, and reinfuses the cells into the same patient. By seeking out cell salvage technology, the plaintiff implied she was not opposed to autologous blood transfusions, i.e., the reinfusion of her own blood. The plaintiff alleges she advised Dr. Fuchs of her beliefs. She believed he would create a treatment plan that would use, when necessary and possible, autologous blood transfusions and other medications and procedures acceptable to her and concordant with her beliefs as a Jehovah’s Witness.
The plaintiff never provided the hospital with any of her own blood nor was she advised to deposit any blood for possible future use. During this pregnancy, the plaintiff saw Dr. Fuchs as an outpatient from September 2003 through March 31, 2004. Because the plaintiff was already pregnant when she first saw Dr. Fuchs, she was not a candidate to donate her own blood for storage. On December 5, 2003, a sonogram performed at SIUH showed total placenta previa, a condition where the placenta sits over the birth canal. On February 17, 2004, a second sonogram showed only marginal placenta previa, which is a partial covering of the birth canal. On March 26, 2004, a third sonogram showed a low lying placenta situated two centimeters from the cervical opening and not actually in or over any part of the birth canal.
One week later, on April 3, 2004, the plaintiff entered SIUH because she had vaginal bleeding and early onset labor. Upon admission to the labor and delivery area, the plaintiff was hav *209 ing irregular contractions, and her cervix was dilated to between four and five centimeters. Because a previous test showed the plaintiff was colonized with Group B Streptococcus, the plaintiff received two doses of intravenous ampicillin, which is an antibiotic. This prophylactic antibiotic therapy was followed by augmentation of labor with Pitocin, a synthetic oxytocin that enhances cervical contractions to assist giving birth. The next day, on April 4, 2004, Dr. Fuchs performed a median episiotomy (a cervical incision of the vaginal opening that facilitates vaginal delivery). A healthy male infant was delivered at 11:40 a.m., and at 11:44 a.m. the placenta was delivered. However, bleeding continued despite further treatment with Pitocin and uterine massage.
A manual exploration of the uterus extracted fragments of retained placental tissue. Because of persistent bleeding, the patient was brought to an operating room. Uterine curettage was performed, and additional placental tissue was extracted. However, bleeding continued despite the administration of Methergine and Hemabate (medications to staunch the flow of blood), and despite uterine packing. Although other modalities of treatment were considered, Dr. Fuchs performed a supra-cervical hysterectomy without cell saving technology.
Because of her total blood loss, the plaintiff was advised that she would die without an allogenic blood transfusion. Dr. Fuchs asserts that the plaintiff indicated her husband should decide whether she should be transfused. In extremis, the plaintiff finally nodded consent, but due to her weakened condition, she could not sign the consent forms herself. The plaintiffs husband had authority as a health care proxy for his wife. He signed the forms to indicate the plaintiff’s consent to receive allogenic blood transfusions. The plaintiff now states she has no recollection of these events.
The plaintiff was transfused with two units of allogenic packed red blood cells, two units of allogenic fresh frozen plasma and one unit of cryoprecipitate. The plaintiff was stabilized and she was given Procrit to stimulate the bone marrow to produce red blood cells. Following the plaintiffs surgery, she was first taken to the recovery room, and then to an intensive care unit.
SIUH and Dr. Fuchs state that pathological examination of the uterus later showed placenta increta, a penetration of the placenta into the uterine musculature associated with increased risk of uterine hemorrhage. Five days later, on April 9, 2004 the patient had improved adequately and she was discharged from the hospital.
*210 Discussion
“[Mjedical malpractice is a breach of a doctor’s duty to provide his or her patient with medical care meeting a certain standard.”[1] “The requisite elements of proof in a medical malpractice action are a deviation or departure from accepted community standards of practice and evidence that such departure was a proximate cause of injury or damage.”[2]
“On a motion for summary judgment, a defendant doctor has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby.”[3] “In opposition, a plaintiff must submit evidentiary facts or materials to rebut the defendant’s prima facie showing, so as to demonstrate the existence of a triable issue of fact.”[4] In actions founded upon medical malpractice, where there are conflicting medical opinions, any issue of credibility must be resolved by a trier of fact.[5] To succeed in a defendant’s motion for summary judgment, the defendant must prove every critical element of the defense.[6] Similarly, the plaintiffs motion must show proof of each material element of the cause of action.[7] Where the plaintiffs claim fails to state each essential element of a claim, the claim must be dismissed.[8] The Plaintiff Has Failed to Make a Prima Facie Case for Medical Malpractice
The plaintiff provided an expert affidavit from Dr. Jeffrey Soffer, M.D., who alleged deviations from the standard of care that resulted in the plaintiff receiving transfusions. According to Dr. Soffer, the plaintiff had arrested dilation during delivery, which by itself showed the need for a caesarean section. Dr. Soffer reasoned that a caesarean section would have obviated the need for the blood transfusion. He further stated that notwithstanding the ultrasonic imaging, placenta previa should have been anticipated and a caesarean section should have been done as an early option. Further, Dr. Soffer stated that, although he *211 has not had an opportunity to evaluate pathological specimens, it is his opinion that it is unlikely the plaintiff had placenta increta as a cause of bleeding. However, Dr. Softer fails to proffer an action or an omission that resulted in any “injury” to the plaintiff other than a need for the blood transfusion. There is no dispute that a transfusion was required to save the plaintiffs life. Neither the plaintiff nor Dr. Softer show that the blood transfusion was the cause of any damages recoverable at law in an action based on medical malpractice. The court is presented with determining whether properly giving a life-saving blood transfusion may result in a claim for medical malpractice. Administering a blood transfusion without informed consent is best characterized as a battery rather than medical malpractice.[9] As a result of such battery, emotional distress could conceivably result. However, neither battexy, nor intentional infliction of emotional distress were pleaded. Moreover, the plaintiff did not allege that Dr. Fuchs and she entered into a contract that she not be transfused with allogenic blood; ergo, there is no breach of contract. The New York Court of Appeals has ruled on several cases involving blood transfusions which alleged: disease transmitted by transfusion;[10] failure to give a blood transfusion;* [11] delayed transfusion;[12] giving incompatible blood;[13] and failure to complete an interrupted transfusion in a timely fashion.[14] But, there is no precedent for finding medical malpractice when a blood transfusion was the proximate cause of saving a life. Here, the plaintiff may be offended or even emotionally distressed that another person’s blood was transfused into her body, which is apparently not in keeping with her beliefs as a Jehovah’s Witness. Notwithstanding the fact that the plaintiffs husband, another Jehovah’s Witness who was her health care proxy, signed a consent for the transfusion, the plaintiff’s emotional distress concerning the blood transfusion does not rise to the level of an injury, as that term is used as an element of a medical malpractice action. The plaintiffs argument taken to its logical conclusion is that the doctor should have allowed her (the mother of two children) to die rather than give her an allogenic blood transfusion. Since the plaintiffs transfusion *212 saved her life, this action is analogous to one for “wrongful life” against the doctor. However, there is no cause of action for “wrongful life” in the State of New York.[15] In this case there is no departure from good and accepted medical care and there is no proximate cause of a legally recognized injury. Consequently, the plaintiff has failed to plead a prima facie case for medical malpractice.
Dr. Fuchs’ Motion for Summary Judgment is Granted
The defendant Dr. Fuchs also moved for summary judgment based upon the expert testimony affidavit provided by Dr. Vincent D’Amico, who states there was no departure from accepted standards of care because there was no placenta previa at the time of delivery. Dr. D’Amico also asserts that the presence of placenta previa at an earlier time during pregnancy is not an indication for a caesarean section at the time of delivery if the placenta previa has resolved on ultrasound at the time of delivery. Consequently, vaginal delivery was proper and there was no need for caesarean section. Furthermore, given the resolution of the placenta previa, excessive bleeding could not have been anticipated. He also states that postpartum hemorrhaging could not have been anticipated and that all appropriate measures were taken to treat the hemorrhage including the decision to perform a hysterectomy. Dr. D’Amico asserts that cell salvage technology could not have been used for the plaintiff because the hemorrhagic blood was contaminated.
In rebuttal, Dr. Softer, the plaintiff’s expert, states that placenta previa was still present and, therefore, vaginal delivery should not have been attempted. Instead, he asserts that a caesarean section should have been performed at the onset of labor where there would have been no uncontrolled hemorrhage and no need for a transfusion.
Dr. Soffer’s opinion as to the continued presence of placenta previa is contrary to the sonogram readings and appears to be speculating as to the facts. Nonetheless, Dr. Fuchs asserts that a reasonable person would accept a blood transfusion to save her life. The plaintiff has asserted that she is a long-time, devout believer in the principles of the Jehovah’s Witnesses, of which a central tenet of belief is aversion to blood transfusions and certain blood products. Prior to transfusion, the plaintiffs circumstances were emergent. Moreover, the plaintiff communicated her consent through a nod of the head to her *213 husband, who signed the consent form as her health care proxy. Therefore a prima facie case for failing to obtain informed consent was not made under Public Health Law § 2805-d (3) (see infra).
The plaintiff fails to show a deviation from a standard of care that was a proximate cause or a substantial factor causing any compensable injury resulting from medical malpractice. Therefore, in the absence of a prima facie case of medical malpractice, summary judgment is found in favor of Dr. Fuchs. SIUH’s Motion to Dismiss the Plaintiffs Causes of Action
SIUH moves for summary judgment to dismiss the plaintiffs causes of action claiming it did not depart from proper standards of care in its treatment of the plaintiff, and that it cannot be held liable for alleged acts of malpractice of a private attending physician. SIUH further states it is not liable for alleged lack of informed consent for the administration of blood products against the plaintiffs will. The defendant SIUH presented the expert affirmation of Dr. Howard G. Nathanson, M.D., who stated that there was no deviation from the proper standard of care in its treatment of the plaintiff. According to Dr. Nathanson, the progressive resolution of placenta previa on sequential ante-natal ultrasounds and the absence of ultrasound evidence of placenta previa at the time of birth showed an absence of increased risk of bleeding and no clear indication for caesarean section. Furthermore, the placenta increta, which was the cause of bleeding, was unforeseeable. Therefore, SIUH was not negligent in the care provided to the plaintiff.
Moreover, SIUH was operating under the direction of Dr. Fuchs, a private attending physician. Hospitals operating under the direction of an independent medical practitioner are not liable for the actions of that independent practitioner unless the orders given by the practitioner are clearly contraindicated by common practice.[16] Dr. Nathanson’s opinion is that Dr. Fuchs’ orders clearly were not medically contraindicated, and therefore, SIUH is not liable for Dr. Fuchs’ actions. A hospital is liable only for the actions of its own employees.[17]
The plaintiffs expert, Dr. Soffer, states there were deviations from proper medical care by contending that the sonogram was improperly interpreted and that SIUH failed to properly provide for cell salvage technology. Dr. Soffer also contends that Dr. *214 Fuchs’ choices in the care of the plaintiff were contraindicated and should have been overridden by the staff of SIUH. In addition, the plaintiff states that Dr. Frank Forte, a representative of the hospital’s bloodless program, participated in her care. The record shows that hospital resident physicians, including Dr. Avi Davidov and Dr. Inna Taubman, also participated in the plaintiffs care during critical stages, as well as other hospital personnel. Therefore, the plaintiff argues that SIUH is not insulated from liability by the plaintiffs private obstetrician, Dr. Fuchs. However, in the absence of a deviation from an accepted standard of care, which proximately caused an injury resulting from the transfusion, a prima facie case for malpractice has not been pleaded nor proved.
No Lack of Informed Consent
SIUH asserts there has been no lack of informed consent by administering blood products. Public Health Law § 2805-d (L) through (3) state in part:
“Limitation of medical, dental or podiatric malpractice action based on lack of informed consent “I. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical, dental or podiatric practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.
“2. The right of action to recover for medical, dental or podiatric malpractice based on a lack of informed consent is limited to those cases involving. .. (a) non-emergency treatment, procedure or surgery. . .
“3. For a cause of action therefor it must also be established that a reasonably prudent person in the patient’s position would not have undergone the treatment or diagnosis if he had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought.” (Emphasis added.)
Dr. Nathanson’s expert affirmation avers that the alternatives, risks and benefits were provided to the plaintiff for consideration. He states that the need for allogenic transfusion as a life-saving necessity was appropriately communicated to the plaintiff, and that the plaintiff and her husband properly *215 consented to the transfusion. Since the plaintiff required emergency treatment, Public Health Law § 2805-d (2) applies. Therefore, there is no right of action based upon a lack of informed consent for such emergency treatment.
Dr. Soffer, the plaintiffs expert, opposes Dr. Nathanson by stating that the use of cell salvage technology should have been anticipated and precautionary measures preplanned, because the exigencies of the plaintiffs course were foreseeable. But Dr. Softer fails to disclose what the alternative would be for the early onset labor and excessive vaginal bleeding before and after the delivery of the child. In the absence of compensable damage and of proximate cause or significant contribution, the plaintiff has failed to establish a prima facie case of medical malpractice. Therefore, summary judgment is awarded to SIUH. The Plaintiffs Cross Motion to Strike the Answer of SIUH is Denied
The plaintiffs attorney filed a note of issue with a statement of readiness for trial on July 19, 2010. On September 17, 2010, the defendants filed the instant motion for summary judgment dismissing the plaintiffs causes of actions that was returnable on October 22, 2010. By a series of stipulations, the parties extended the time available for the plaintiff to file an opposition to the motion. The last stipulation provided that the plaintiffs opposition was due on January 12, 2011 and the defendants’ reply was due on February 2, 2011, with a return date of February 4, 2011. However, the plaintiff cross-moved on January 24, 2011 to strike the answer of SIUH because it had not responded to the plaintiff’s earlier disclosure demands. The plaintiffs cross motion for summary judgment is late. Notwithstanding the parties’ stipulations to allow the plaintiff to oppose the defendants’ motion for summary judgment, the plaintiff s cross motion seeking affirmative relief was still subject to the Thirteenth Judicial District’s 60-day rule in which to file such a motion for summary judgment, after the note of issue was filed.[18] Consequently, the cross motion is denied. Nonetheless, the merits of the cross motion were reviewed.
In the Thirteenth Judicial District, the plaintiff is required to have a certification order issued which states that discovery is complete, but may allow for specified updated authorizations and specified outstanding items to be provided at a later time. *216 Here, there were no such specified items. Following the issuance of a certification order, the plaintiff may file a note of issue and a statement of readiness for trial within 10 days. Here, there was a compliance order dated July 22, 2009, which required completion of all disclosure demands by August 7, 2009. This order clearly predated the subsequent certification conference, where the parties to this action confirmed their readiness to file a note of issue. No deficiencies of discovery were noted at that time. Consequently, a certification order was issued with no conditions contained therein. The plaintiff then filed a note of issue on July 19, 2010. While the plaintiff may have previously requested information that she now represents as missing, at the time the certification order was issued, the deficit of that material was either ignored, or not considered important by the plaintiff. The plaintiff may not now assert that the absence of such information warrants striking the answer of SIUH. Therefore the plaintiffs cross motion requesting SIUH’s answer be stricken for failure to provide disclosure is denied.
Accordingly, it is hereby ordered, that the motion by defendant Staten Island University Hospital for summary judgment seeking the dismissal of the cause of action brought by the plaintiff Nancy DiGeronimo is granted in its entirety; and it is further ordered, that the motion by defendant Allen Fuchs, M.D. for summary judgment seeking the dismissal of the cause of action brought by the plaintiff Nancy DiGeronimo is granted in its entirety; and it is further ordered, that the cross motion made by the plaintiff Nancy DiGeronimo to strike the answer of the defendant Staten Island University Hospital is denied in its entirety; and it is further ordered, that in accordance with the foregoing decision and orders, and there being no other surviving causes of action, this case is dismissed.

. Bazakos v Lewis, 12 NY3d 631, 634 (2009).

. Deutsch v Chaglassian, 71 AD3d 718, 719 (2d Dept 2010), quoting Geffner v North Shore Univ. Hosp., 57 AD3d 839, 842 (2d Dept 2008).

. Rebozo v Wilen, 41 AD3d 457, 458 (2d Dept 2007), quoted in Deutsch v Chaglassian, 71 AD3d at 719.

. Deutsch v Chaglassian, 71 AD3d at 719.

. Id.

. Cerny v Williams, 32 AD3d 881, 883 (2d Dept 2006).

. Phillips v City of New York, 66 AD3d 170, 189, n 26 (1st Dept 2009).

. EECP Ctrs. of Am. v Vasomedical, Inc., 265 AD2d 372 (2d Dept 1999).

. Salandy v Bryk, 55 AD3d 147 (2d Dept 2008).

. Weiner v Lenox Hill Hosp., 88 NY2d 784 (1996).

. Scharlack v Richmond Mem. Hosp., 63 NY2d 900 (1984).

. Eisen v Mather Mem. Hosp., 278 AD2d 272 (2d Dept 2000).

. Lafferty v Manhasset Med. Ctr. Hosp., 54 NY2d 277 (1981); Weiss v Rubin, 9 NY2d 230 (1961).

. Pigno v Bunim, 35 NY2d 841 (1974).

. Alquijay v St. Luke’s-Roosevelt Hosp. Ctr., 63 NY2d 978, 979 (1984).

. Hill v St. Clare’s Hosp., 67 NY2d 72, 79 (1986).

. Id.; see also Sampson v Contillo, 55 AD3d 588, 590 (2d Dept 2008).

. See CPLR 3212 (a); 13th Jud Dist, Sup Ct, Richmond County, Uniform Civil Term Rules, Motion Requirements (4).